**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

**CASE NO.  1:22-cv-10098**

DEZIGN NA, LLC, and
JEREMY KEITH RITTER,

            Plaintiffs,

   v.

SEAMLESS CAPITAL GROUP LLC,
UNITED FUND USA, LLC,
LIBERTAS FUNDING, LLC,
CLOUDFUND LLC,
MEGED FUNDING GROUP CORP. and
JOHN and JANE DOE DEFENDANTS,

            Defendants,

**COMPLAINT**

Plaintiffs, DEZIGN NA, LLC and JEREMY KEITH RITTER (collectively, Plaintiffs) sue Defendants, SEAMLESS CAPITAL GROUP LLC, UNITED FUND USA, LLC, LIBERTAS FUNDING, LLC, CLOUDFUND LLC, MEGED FUNDING GROUP CORP. (collectively, the "MCA-Funder Defendants") as well as the JOHN and JANE DOE DEFENDANTS (the "John/Jane Doe Defendants") and, in support hereof, states as follows:

**SUMMARY OF THE CLAIMS**

1.     This lawsuit is brought by DEZIGN NA, LLC ("DeZign") against five lenders.

2.     Each of the Defendants are business funders who prey upon their victims by offering them funding in the form of so-called a "merchant cash advance" or "MCA".  MCA agreements are financial products, often marketed to small businesses through high-pressure sales operations resembling "boiler rooms," that purport to purchase at a discount a portion of a

business's future receivables.

3.      These merchant cash advances are in fact unlawful, usurious loans with interest rates between 50% and over 400% per annum, far above the maximum rate permissible for a loan under New York law.  Defendants deduct daily (or weekly) amounts directly from DeZign's bank account(s) regardless of the amount of receipts that DeZign earned that day.

4.      To evade applicable usury statutes, each of the Defendants' loans were disguised as a purchase and sale of future receivables agreement, but its terms, conditions and Defendants' actions demonstrate that, despite the agreement's form, no sale of receivables took place. Rather, each agreement was intended to be a loan from inception and each Defendant's conduct and the documents plainly demonstrate that such Defendant is not actually purchasing receivables or future receipts but using this false construct to hide an unlawful loan transaction.

5.      While it is bad enough when a merchant/business has one or two merchant cash advances, the harm is multiplied and compounded in situations like the within case where a business, like DeZign, is forced to take a second MCA in order to keep up the payments on the first MCA, then a third MCA to keep up the payments on the first and second MCAs and to keep the business afloat by replacing the money being automatically deducted each day from the company's bank account by other funders regardless of such company's daily receipts.

6.      Before long, DeZign NA, LLC had six (6) different MCA agreements (with five (5) different MCA Funders) and the Defendants were collectively debiting over $140,000.00 per week from its bank account.

7.      This case is indicative of the abuses in this industry and how such abuses resulted in a downward spiral of unending debt for DeZign NA, LLC.  Rather than shut down its business or be forced into bankruptcy, Plaintiffs turn to this Court for much-needed relief.

8.      It is against this backdrop that Plaintiffs bring claims against these MCA-Funder Defendants (including the John and Jane Doe Defendants) sounding in RICO, racketeering

conspiracy and breach of contract.

## THE PARTIES

9.     Plaintiff, DEZIGN NA, LLC ("DeZign") is a Florida limited liability company, with its principal place of business in Port St. Joe, Gulf County, Florida.

10.     Plaintiff, JEREMY KEITH RITTER ("Mr. Ritter") resides in, and is a citizen of, the State of Florida.

11.     Defendant, SEAMLESS CAPITAL GROUP LLC ("Seamless Capital"), is Florida limited liability company with its principal place of business located in Miami-Dade County, Florida.

12.     Defendant, UNITED FUND USA, LLC ("United Fund") is a New York limited liability company with its principal place of business located in New York County, New York.

13.     Defendant, LIBERTAS FUNDING, LLC ("Libertas Funding"), is a Delaware limited liability company with its principal place of business located in Greenwich, Fairfield County Connecticut.

14.     Defendant, CLOUDFUND LLC ("Cloudfund"), is a New York limited liability company with its principal place of business located in Rockland County, New York.

15.     Defendant, MEGED FUNDING GROUP CORP ("Meged Funding"), is a New York limited liability company with its principal place of business located in Rockland County, New York.

16.     The John/Jane Doe Defendants are the various officers and owners of each of the Defendants, as well as the investors in these corporate Defendants, who participated in this illegal scheme and whose identities will be sought during the course of discovery in this case.

## JURISDICTION AND VENUE

17.     This Court has subject-matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1331 based on Plaintiffs' claims for violations of the Racketeer Influenced and Corruption

Organizations Act, 18 U.S.C. §§ 1961–68.

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(3).

19.     Each Defendant is subject to the personal jurisdiction of this Court because each Defendant has voluntarily subjected itself/himself/herself to the jurisdiction of this Court; regularly transacts business within the State of New York, and/or has purposefully availed himself of the jurisdiction of this Court for the specific transactions at issue.

20.     Each of the MCA-Defendants, in its MCA Agreement, provides that venue is proper in the State of New York.

21.     All conditions precedent to the bringing of this action have occurred, been performed or have been otherwise waived.

## GENERAL ALLEGATIONS

22.     DeZign is owned and controlled by the individual Plaintiff, Mr. Ritter.

23.     DeZign is a family-owned manufacturer and distributor of residential and commercial waterproof and hardwood floor covering products with offices and distribution centers in Georgia and Florida.

24.     Like many other small businesses, DeZign suffered financially in recent years, especially during the heart of the pandemic.

25.     While DeZign had previously relied primarily on traditional lenders, it recently fell victim to a group of funders who provide what has been called payday loans for business called merchant cash advances.

26.     The MCA-Funder Defendants loan money to merchants, like DeZign, under the guise of a merchant cash advance, which they describe as a 'purchase and sale of future receivables.' As a general matter, an issuer of a merchant cash advance provides a merchant with a lump sum payment in exchange for a share of the merchant's future sales income/receipts, or "receivables," up to a certain total repayment amount.

27.     As a result, unlike a loan, a true merchant cash advance does not guarantee an issuer with a regular payment or a fixed, finite term.   Instead, payment amounts may vary through a "reconciliation" process in which the issuer "reconciles" the merchant's payment amounts in accordance with the merchant's actual receivables.  Because payment amounts vary, the lengths of repayment terms also vary.

28.     This variability and lack of security create certain risks for funders but also create certain protections for merchants by being able to reduce required payments when business is slow.

29.     In contrast, a traditional closed-end installment loan has a fixed regular payment amount and a finite repayment term.  In exchange for the certainty this structure provides for creditors (and the rigidity it imposes on borrowers), New York law guarantees certain protections to loan borrowers, including a maximum annual interest rate of 16%. The law also imposes certain regulations on loan issuers, including the requirement of specialized licenses and regular oversight by governmental entities.

30.     The Defendants herein attempt to style their transactions as a 'purchases of future receivables' in order to evade New York's 16% interest rate cap and the other legal protections and requirements that exist for loans.   But in fact, each of the MCA-Funder Defendant's transactions function as loans, and, as a result, their customers are entitled to the protections afforded to borrowers under New York law.

31.     The title to the agreements is a sham.   In form, substance and in every conceivable way, each of the MCA-Funder Defendant's agreements function as absolutely repayable loans with interest rates between 50% and over 400% per annum.

32.     Each of the Defendants market and collect upon the cash advances as loans. They each require the recipient of the funding (here, DeZign) to repay the loans through fixed daily or weekly payments, which are debited from the company's bank accounts at set amounts ranging

5

here from $4,766.67 per day (which is $23,833.35 per week) to $9,500.00 per day (which is $47,500.00 per week). They require the loans to be repaid in short terms (anywhere from a mere 30 business days to 42 weeks for these Defendants), at annual interest rates well above the 16% threshold that defines usury under New York law. In fact, the annual interest rates charged by Defendants here it anywhere from over three times this limit to twenty-five times this limit.

33.     Unlike a true purchase of future receivables, Defendants do not set the daily or weekly payment amount as an actual, reality-based, percentage of DeZign's daily or weekly receipts, but they set the daily/weekly payment amount solely upon the term/length of the loan within which such Defendant wants to be repaid.

34.     In other words, while each of the Defendants had access, prior to preparing their form contract and prior to the funding, to all of the necessary financial records including the bank statements of DeZign, none of the Defendants actually tailored the daily payment amount to DeZign's actual receipts. Rather, they pretend to do so in order to circumvent laws designed to protect companies like DeZign.

35.     Each MCA-Funder Defendant's agreements contains the following:

a.  The amount of future receivables that the MCA-Funder Defendant was allegedly purchasing (i.e, Meged Funding was allegedly purchased $143,000.00 of DeZign's future receivables);

b.  The percentage of future receivables allegedly being purchased (i.e., Meged Funding allegedly purchased 25% of DeZign's future receivables);

c.  The amount the funder was to pay to the company for the future receivables (i.e., Meged Funding agreed to pay $100,000.00);[1] and

_____

[1] In every case, the MCA-Funder Defendant never actually funded the amount set forth in the agreement. There were always deductions before the alleged purchase price was wire transferred to the Plaintiff company for items such as underwriting fees, origination fees, ACH set-up fees, due diligence fees, etc. Taking the example of Meged Funding, while the purchase price was set

6

d. The daily or weekly amount to be removed via ACH from the bank account of DeZign (i.e., Meged Funding was to debit the account in the amount of $4,766.67 per day, which would mean the amount would be repaid in 30 weekday payments, or roughly a 1.5 month term).

36.     To further evidence that the 'specified percentage of receivables purchased' is just an artifice in furtherance of pretending that each MCA-Funder Defendant is purchasing a fixed and specific set of receivables, during the several month period at issue for all of these MCA Agreements, DeZign had collectively sold to all of the MCA-Funder Defendants in excess of 200% of its daily/weekly revenue or receipts.  Considering that a company can only sell of assign 100% of its receipts or receivables, the notion that these MCA-Funder Defendants collectively pretended to purchase over 200% of DeZign's receivables is an impossible feat.

37.     Thus, at some point there was absolutely nothing for many of the MCA-Funder Defendants to have purchased from DeZign if the MCA agreements were actually based in reality and were truly a purchase of future receipts.

38.     As part of an MCA funder's pre-funding due diligence process, each MCA-Funder Defendant obtained the last three or six months of DeZign's bank statements (in most cases, this is the total extent of the due diligence each Defendant conducts).  Thus, each subsequent funder was aware of each of the previous/existing agreements since they would be able to see from the bank statements and financial information submitted that, at the time, DeZign was already paying other MCA lenders on a daily or weekly basis.  This alone should demonstrate how the entire 'purchase of future receivables' concept was a farce since it is impossible for DeZign to sell over 100% of its daily/weekly receivables.

---

at $100,000.00, only $92,000.00 was actually funded (nearly 10% less).  A classic bait and switch.

A.      **Specifics About the Merchant Cash Advance Lenders**

39.     Detailed below are the contractual agreements between DeZign and each of the MCA-Funder Defendants.

**Seamless Capital**

40.     On or about September 8, 2022, Seamless Capital loaned DeZign the sum of $381,000.00.  Seamless Capital only funded $349,200.00 attributing the balance to a $31,800.00 origination fee.  See Exhibit A.

41.     In exchange, DeZign was required to re-pay the sum of $476,682.00 over 65 daily payments (roughly a three-month term).  See Exhibit A.

42.     Seamless Capital required that DeZign sign an authorization so that it would be paid via automatic deductions from DeZign's bank account in the sum of $7,350.50 each weekday.  See Exhibit A.

43.     If annualized, the rate of interest on the money provided by Union Funding is approximately 145% per annum (or 208% if you take into account the fees charged).

44.     According to Seamless Capital's agreement, it pretended to be purchasing 49% of DeZign's future income/receipts.

45.     Seamless Capital also required a personal guaranty from Mr. Ritter.

46.     Seamless Capital also took a security interest in ALL of DeZign's assets (not just the receivables) and filed a UCC-1 on all assets of the company including its equipment, inventory, etc.

**United Fund**

47.     On or about September 23, 2022, United Fund loaned DeZign the sum of $300,000.00.  See Exhibit B.

48.     In exchange, DeZign was required to re-pay the sum of $414,000.00 over 44 daily payments (roughly a two month term).  See Exhibit B.

49.     United Fund required that DeZign sign an authorization so that it would be paid via automatic deductions from DeZign's bank account in the sum of $9,500.00 each weekday. See Exhibit B.

50.     If annualized, the rate of interest on the money provided by United Fund is approximately 293% per annum.

51.     According to United Fund's agreement, it pretended to be purchasing 45% of DeZign's future income/receipts.

52.     United Fund also required a personal guaranty from Mr. Ritter.

53.     United Fund also took a security interest in ALL of DeZign's assets (not just the receivables) and filed a UCC-1 on all assets of the company including its equipment, inventory, etc.

### Libertas Funding

54.     Libertas Funding issued two merchant cash advance loans to DeZign

55.     The first loan was issued by Libertas Funding on or about November 3, 2021 and was in the amount of $650,000.00.  Libertas Funding only funded $637,000.00 attributing the balance to a $13,000.00 to an origination fee.  See Exhibit C.

56.     In exchange, DeZign was required to re-pay the sum of $832,000.00 over 42 weeks (roughly a ten-month term).  See Exhibit C.

57.     Libertas Funding required that DeZign sign an authorization so that it would be paid via automatic deductions from DeZign's bank account in the sum of $19,809.55 per week. See Exhibit C.

58.     If annualized, the rate of interest on the money provided by Libertas Funding is approximately 50% per annum (or 56% if you take into account the fees charged).

59.     On this first loan, according to Libertas Funding's agreement, it pretended to be purchasing 20% of DeZign's future income/receipts.

60.     Libertas Funding also required a personal guaranty from Mr. Ritter.

61.     Libertas Funding also took a security interest in ALL of DeZign's assets (not just the receivables) and filed a UCC-1 on all assets of the company including its equipment, inventory, etc.

62.     A few weeks later, on December 13, 2021, Libertas Funding loaned DeZign an additional $200,000.00 under a separate agreement.  Libertas Funding only funded $196,000.00 attributing the balance to a $4,000.00 to an origination fee.  See Exhibit D.

63.     In connection with this second loan, DeZign was required to re-pay the sum of $258,000.00, also over a period of 42 weeks (again, roughly a ten-month term).  See Exhibit D.

64.     Libertas Funding required that DeZign sign an authorization so that it would be paid via automatic deductions from DeZign's bank account in the sum of $6,142.90 per week. See Exhibit D.

65.     If annualized, the rate of interest on the money provided by Libertas Funding on this second loan is approximately 53% per annum (or 58% if you take into account the fees charged).

66.     On this second loan, according to Libertas Funding's agreement, it also pretended to be purchasing exactly 20% of DeZign's future income/receipts.

67.     On this second loan, Libertas Funding also required a personal guaranty from Mr. Ritter.

68.     On this second loan, Libertas Funding also took a security interest in ALL of DeZign's assets (not just the receivables) and filed a UCC-1 on all assets of the company including its equipment, inventory, etc.

**Cloudfund**

69.     On or about January 28, 2022, Cloudfund loaned DeZign the sum of $100,000.00. Cloudfund only funded $92,000.00 attributing $3,000.00 to a due diligence fee and another $3,000.00 to an origination fee.  See Exhibit E.

70.     In exchange, DeZign was required to re-pay the sum of $145,000.00 over 20 weeks (roughly a four and one half month term).  See Exhibit E.

71.     Cloudfund required that DeZign sign an authorization so that it would be paid via automatic deductions from DeZign's bank account in the sum of $7,250.00 per week.   See Exhibit E.

72.     If annualized, the rate of interest on the money provided by Cloudfund is approximately 161% per annum (or 194% if you take into account the various fees charged).

73.     According to Cloudfund's agreement, it pretended to be purchasing 49% of DeZign's future income/receipts.

74.     Cloudfund also required a personal guaranty from Mr. Ritter.

75.     Cloudfund also took a security interest in ALL of DeZign's assets (not just the receivables) and filed a UCC-1 on all assets of the company including its equipment, inventory, etc.

**Meged Funding**

76.     On or about August 17, 2022, Meged Funding loaned DeZign the sum of $100,000.00.   Meged Funding only funded $92,000.00 attributing $8,000.00 "to cover underwriting and the ACH debit program, as well as related expenses."  See Exhibit F.

77.     In exchange, DeZign was required to re-pay the sum of $143,000.00 in 30 daily payments of $4,766.67 per day (roughly a one and one half month term).  See Exhibit F.

78.     Meged Funding required that DeZign sign an authorization so that it would be paid via automatic deductions from DeZign's bank account in the sum of $4,766.67 per weekday.  See Exhibit F.

79.     If annualized, the rate of interest on the money provided by Meged Funding is approximately 403% per annum (or 516% if you take into account the various fees charged).

80.     According to Meged Funding's agreement, it pretended to be purchasing 25% of DeZign's future income/receipts.

81.     Meged Funding also required a personal guaranty from Mr. Ritter.

82.     Meged Funding also took a security interest in ALL of DeZign's assets (not just the receivables) and filed a UCC-1 on all assets of the company including its equipment, inventory, etc.

**The Percentage of Future Receipts Purchased Has No Basis In Reality**

83.     As proof that the 'percentage of future receipts purchased' is a complete sham and has no basis in reality one only needs to compare two or more agreements.  The best example of how both the daily payment amount and the percentage of receivables purchased are numbers simply reverse-engineered by the MCA funder to fit into the time period within which the MCA funder wants to be re-paid is the two loans that DeZign received from Libertas Funding.

84.     The two Libertas Funding agreements were dated only a few weeks apart (November 3, 2021 and December 13, 2021).  See Exhibits C and D.

85.     In the first Libertas Funding agreement, Libertas Funding pretends that it is purchasing 20% of DeZign's weekly future receipts.  Based upon its apparent underwriting, which includes an examination of the past few months of DeZign's bank statements, Libertas Funding concludes that 20% of DeZign's weekly receipts is $19,809.55.  Thus, it sets its automatic weekly ACH payment amount in its first agreement at $19,809.55.  See Exhibit C.

12

86.     Five weeks later, Libertas Funding is prepared to loan DeZign an additional $200,000.00.   Libertas Funding conducts its underwriting (which again largely consists of examining the same past few months of DeZign's bank statements) and Libertas Funding now concludes that the exact same percentage (20%) of DeZign's weekly receipts is about 1/3 of this amount, or $6,142.90.   Accordindgly, for its second agreement, Libertas Funding sets its automatic weekly ACH payment amount in the first agreement at $6,142.90.

87.     When Libertas Funding re-examined DeZign's bank statements and income, it does not reconcile the first loan agreement to reduce the weekly payment amount (since under the first agreement it also is pretending to purchase 20% of DeZign's future weekly receipts). Nor does it ask any questions or do anything different with regard to its first agreement.  While DeZign's actual, reality-based, weekly earnings has not significantly changed during this period, Libertas somehow concludes on November 3, 2021 that 20% of DeZign's estimated future receipts is $19,809.55 per week but on December 13, 2021 the same 20% of DeZign's estimated future receipts is $6,142.90 per week.  There is no logical way to account for this huge disparity.

88.     But this all does not matter.  Because the numbers in these agreements are just filled-in to support the sham that these lenders are pretending to be purchasing future receipts when they are actually just issuing loans and charging criminally usurious interest rates.   In other words, the 'percentage of future receipts' and the 'weekly payments amount' is simply a product of how quickly the MCA-Funder Defendant wants to be re-paid.  In the case of Libertas Funding, its agreements are set up so that each loan is to be fully repaid in exactly 42 weeks (approximately 10 months) and at factor of either 1.28 or 1.29.  The rest of the numbers are simply reverse engineered to fit into this loan term.

89.     This is also apparent when you compare two agreements from different funders. A comparison of the agreements of Seamless Capital and Cloudfund – each pretending to have purchased 49% of DeZign's future weekly receipts – is set forth below:

| MCA Funder | Percentage of Receivables 'Purchased' | Weekly Payment |
|---|---|---|
| Seamless Capital | 49% | $36,750.00 |
| Cloudfund | 49% | $7,250.00 |

90.     Thus, while both MCA funders examined DeZign's bank statements (and often times this is the extent of the due diligence an MCA funder performs) Cloudfund determined that 49% of DeZign's weekly revenue is $7,250.00 while Seamless Capital determined that 49% of DeZign's weekly revenue is **five times** this amount, or $36,7450.  The reason is simple:  the concept that these funders are actually purchasing a fixed percentage of future revenue is completely fabricated and the numbers are really only based on how quickly a funder wants to re-paid via daily or weekly payments.

**<u>The MCA Agreement Are Substantively and Procedurally Unconscionable</u>**

91.     Each of the MCA Agreements described above (the "MCA Agreements") are unconscionable contracts of adhesion that are not negotiated at arms-length.

92.     Instead, they contain one-sided terms that prey upon the desperation of the small business and their individual owners (like the Plaintiffs herein) and help conceal the fact that the transactions (collectively the "Transactions"), including those involving DeZign, are really loans.

93.     Among these one-sided terms, the MCA Agreements include: (1) a provision giving the MCA company the irrevocable right to withdraw money directly from DeZign's bank accounts, including collecting checks and signing invoices in the merchant's name, (2) a provision preventing DeZign from transferring, (3) moving or selling the business or any assets without permission from the MCA company, (4) a one-sided attorneys' fees provision obligating DeZign to pay the MCA company's attorneys' fees but not the other way around, (5) a venue and choice-of-law provision requiring DeZign to litigate in a foreign jurisdiction under the laws of a foreign jurisdiction, (6) a personal guarantee, the revocation of which is an event of default, (7) a

jury trial waiver, (8) a class action waiver, (9) a collateral and security agreement providing a UCC lien over all of DeZign's assets, (10) a prohibition of obtaining financing from other sources, (11) the maintenance of business interruption insurance, (12) an assignment of lease DeZign's premises in favor of the MCA company, (13) the right to direct all credit card processing payments to the MCA company, (14) a power-of-attorney "to take any and all action necessary to direct such new or additional credit card processor to make payment to [the Enterprise]," and (15) a power of attorney authorizing the MCA company "to take any action or execute any instrument or document to settle all obligations due…."

94.     The MCA Agreements are also unconscionable because they are designed to fail. Among other things, the MCA Agreements are designed to result in a default in the event that DeZign's business suffers any downturn in sales by (1) forcing DeZign to wait until a specified day of each month before entitling it to invoke the reconciliation provision, (2) preventing DeZign from obtaining other financing, (3) and requiring DeZign to continuously represent and warrant that there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of merchant.

95.     The MCA Agreements also contain numerous improper penalties that violate New York's strong public policy.  Among these improper penalties, some of the MCA Agreements (1) require DeZign to sign a confession of judgment entitling the MCA company to liquidated attorneys' fees based on a percentage of the amount owed rather than a good-faith estimate of the attorneys' fees required to file a confession of judgment, (2) accelerate the entire debt upon an Event of Default, and (3) require the merchant to turn over 100% of all of its receivables if it misses just a few fixed daily or weekly payments.

**B.      The MCA Agreements Each Uses a Sham**
**Reconciliation Provision to Disguise the Loans.**

96.      In order to evade New York usury laws, each of the MCA-Funder Defendants includes a sham reconciliation provision in the MCA Agreements to give the appearance that the loans do not have a definite term.

97.      Under a legitimate reconciliation provision, if DeZign pays more through its fixed daily or weekly payments than it actually received in receivables, DeZign is entitled to seek the repayment of any excess money paid.  Thus, if sales decrease, so do the payments.

98.      For example, if an MCA company purchased 25% of DeZign's receivables, and DeZign generated $100,000 in receivables for the month, the most that the MCA company is entitled to keep is $25,000.  Thus, if DeZign paid $40,000 through its daily or weekly payments, then DeZign is entitled to $15,000 back under the sham reconciliation provision.

99.      In order to ensure that DeZign can never use their sham reconciliation provision, however, each of the MCA-Funder Defendants falsely represents that the fixed daily payment amount is a good-faith estimate of the percentage of receivables purchased.  By doing so, the MCA-Funder Defendant ensures that if sales decrease, the required fixed daily or weekly payments remain the same.

100.      For example, if 25% of DeZign's actual monthly receivables would result in a daily payment of $1,000, MCA-Funder Defendant falsely states that the good-faith estimate is only $500 per day so that if sales did in fact decrease by 50%, DeZign would not be able to invoke the reconciliation provision.

101.      On information and belief, none of the MCA-Funder Defendants actually has a reconciliation department, does not perform reconciliations, and has never refunded a merchant money as required under their sham reconciliation provision.

102.    In fact, each of the MCA Agreements specifically requires the MCA funder to affirmatively reconcile the accounts each month but never do.

**D.    <u>The Defendants Intentionally Disguised the True Nature of the Transactions</u>**.

103.    Despite their documented form, the Transactions are, in economic reality, loans that are absolutely repayable.  Among other hallmarks of a loan:

(a)    The daily or weekly payments required by the MCA Agreements were fixed and the so-called reconciliation provision was mere subterfuge to avoid this state's usury laws.  Rather, just like any other loan, the purchased amount was to be repaid within a specified time;

(b)    The default and remedy provisions purported to hold the Plaintiffs absolutely liable for repayment of the purchased amount.  The loans sought to obligate DeZign to ensure sufficient funds were maintained in a designated account to make the daily or weekly payments and, after a certain number of instances of insufficient funds being maintained in the account, DeZign was in default and, upon default, the outstanding balance of the purchased amount became immediately due and owing;

(c)    While the MCA Agreements purported to "assign" all of the DeZign's future account receivables to the MCA-Funder Defendant until the purchased amount was paid, DeZign retained all the indicia and benefits of ownership of the account receivables including the right to collect, possess and use the proceeds thereof. Indeed, rather than purchasing receivables, the MCA-Funder Defendants merely acquired a security interest in the DeZign's accounts to secure payment of the purchased amount;

(d)     Unlike true receivable purchase transactions, the Transactions were underwritten based upon an assessment of each of DeZign's credit worthiness; not the creditworthiness of any account debtor;

(e)     The purchased amount was not calculated based upon the fair market value of DeZign's future receivables, but rather was unilaterally dictated by the MCA-Funder Defendant based upon the interest rate it wanted to be paid.  Indeed, as part of the underwriting process, none of the MCA-Funder Defendants ever requested any information concerning DeZign's account debtors upon which to make a fair market determination of their value;

(f)     The amount of the daily or weekly payments was determined based upon when the MCA-Funder Defendant wanted to be paid, and not based upon any good-faith estimate of DeZign's future account receivables;

(g)     None of the MCA-Funder Defendants assumed a risk of loss due to DeZign's failure to generate sufficient receivables because the failure to maintain sufficient funds in DeZign's bank account constituted a default under the agreements;

(h)     The MCA-Funder Defendant required that DeZign undertake certain affirmative obligations and make certain representations and warranties that were aimed at ensuring the company would continue to operate and generate receivables and a breach of such obligations, representations and warranties constituted a default, which fully protected the MCA-Funder Defendant from any risk of loss resulting from DeZign's failure to generate and collect receivables; and.

(i)     Each of the MCA-Funder Defendants required that DeZign grant it a security interest in its receivables and other intangibles (and many in equipment,

inventory and other assets) and, further that the individual owners personally guarantee the performance of the representations, warranties and covenants, which the MCA-Funder Defendants knew were breached from day one.

104.    The MCA-Funder Defendants also show in each of its underwriting practices that their agreements are loans.   Typically, banks and other institutions that purchase account receivables, perform extensive due diligence into the credit worthiness of the account debtors whose receivables they are purchasing.   When underwriting new transactions including those entered into with DeZign herein, none of the MCA-Funder Defendants evaluated DeZign's receivables, which are the assets they are purportedly buying, but instead focus on other factors such as DeZign's credit ratings and bank deposits over a 3 or 6 month period (if they perform any due diligence at all).

105.    When the MCA-Funder Defendants collect upon their agreements, it treats them just like loans.   For example, each MCA-Funder Defendant requires that DeZign enter into an MCA Agreement make fixed daily or weekly payments and grant security interests to the MCA-Funder Defendant in all or substantially all of DeZign's assets to ensure that the daily or weekly payments are made.

106.    Many of the MCA-Funder Defendants also require that DeZign execute confessions of judgment that the MCA-Funder Defendant could file if DeZign fails to make as few as two daily or weekly payments under their agreements.   In other words, the MCA-Funder Defendant structures its transactions to function just like the loans they are intended to be and not the receivable purchases they purport to be.

107.    DeZign fell victim to all of these predatory tactics.

**E.    <u>Each of the MCA Agreement Were Not Sales of Future Receipts</u>**.

108.    The terms and conditions of many of the MCA Agreements are identical and, if not, substantially similar.

19

109.     Notwithstanding their titles, the MCA Agreements were not the sale/purchase of receivables.  Plain and simple, there were loans.

110.     The MCA Agreements have none of indicia of a true sale and all the indicia of a loan.  Among other things: (i) the future receipts allegedly purchased by many of the later MCA-Funder Defendants had already been sold to an another MCA-Funder Defendants under a previously executed agreement (which would be obvious from the daily debits shown on the bank statements that each of the MCA-Funder Defendants requested from DeZign); (ii) each of the MCA Agreements failed to transfer the risk and benefits of ownership of the future receipts from DeZign to a MCA-Funder Defendant; (iii) DeZign remained absolutely liable for repayment of the 'purchased amounts'; (iv) Each of the MCA-Funder Defendants had full recourse rights against DeZign and its principal, Mr. Ritter; (v) the daily or weekly payments amounts were fixed and required payment within the specific time period chosen by the MCA-Funder Defendant; and (vi) each of the MCA Agreements' reconciliation provisions is a sham.

111.     By the time that many of the later MCA Agreements were executed by DeZign and one of the MCA-Funder Defendants, there were no future receipts left to purchase since DeZign had already purportedly sold over 100% of its daily revenue.  This further evidences the nature of the sham.

**F.      The Terms of Each of the MCA Agreement Fail to
Transfer the Risks and Benefits of Ownership of Future
Receipts from DeZign to a MCA-Funder Defendant**.

112.     The *sine qua non* of any sale is that absolute title and ownership of the allegedly purchased good transfer from the seller to the buyer.  That did not occur in connection with any of the MCA Agreements or Transactions here.

113.     Here, DeZign was responsible for generating and collecting the future receipts, it exercised complete dominion and control over the future receipts and it retained the risk of non-collectability with respect to the future receipts.  In other words, notwithstanding the sale and

assignment language of the MCA Agreements, all of the benefits and risks of ownership of the future receipts remained with DeZign.

114.    Pursuant to the each of the MCA Agreements, the pretend seller (DeZign) was responsible for collecting the proceeds of its transactions and depositing a "Specified Percentage" of each transaction into a designated account so that one of the MCA-Funder Defendants could debit the daily or weekly payments.

115.    So long as it made the daily or weekly payments, the pretend seller (here, DeZign) was free to use the remaining proceeds of any transaction, including the proceeds of a supposedly purchased future receipt, in its daily operations.

116.    Indeed, the excess proceeds were supposedly each DeZign's only source of operating capital because each of the MCA Agreements specifically prohibited DeZign from further encumbering the future receipts.  Thus, DeZign had to use the proceeds of the allegedly purchased future receipts in order to operate its business.

117.    DeZign's complete dominion and control over the future receipts and its right to use the proceeds of the alleged purchased future receipts are entirely inconsistent with a sale because such control and rights are the benefits of ownership that would pass to the seller if the MCA Agreements were a true sale.

118.    Similarly, DeZign retained the risk of loss associated with non-payment of the future receipts.  Among other things, if a particular future receipt was not collectible, there was no reduction in the purchased amount and each MCA-Funder Defendant would be repaid from the next collected future receipt or the proceeds of any other sale transaction.

G.     **DeZign Remained Absolutely Liable**
       **for Repayment of the Purchased Amount**

119.    By operation of the default rights and remedies under the MCA Agreements, repayment of the purchased amount was put beyond any risk of non-payment and DeZign remained absolutely liable for repayment of the purportedly purchased amounts.

120.    Under each of the MCA Agreements, if an event of default occurred, DeZign, as the pretend sellers of the future receipts, immediately became liable for the full outstanding purchased amounts, together with additional fees and costs due under the MCA Agreements.

121.    An event of default is defined under the MCA Agreements so that a default would occur under any and every conceivable circumstance wherein the pretend seller (DeZign) failed to generate or collect future receipts to repay the MCA-Funder Defendant.

122.    Most importantly, the failure of DeZign (the pretend seller of the future receipts) to generate and collect sufficient revenue to make the daily or weekly payments would automatically constitute an Event of Default under each of the MCA Agreements after just a few days of having insufficient funds ("NSF") in the account which is set up for automatically daily ACH debits.

123.    It would also be an Event of Default under each of the MCA Agreements if the DeZign/the pretend seller of the future receipts: (i) violated any term of the agreements; (ii) transferred or otherwise sold its assets; or (iii) moved, terminated, interrupted or suspended its business in any way.  Accordingly, even if DeZign's business was destroyed or suspended by a hurricane, flood, fire, a pandemic or other Act of God, it would be in default of the MCA Agreements and, pursuant to the remedies provided by such Agreement, each Plaintiff would be immediately liable for the full outstanding balance of purchased amount, plus all fees and costs due under the MCA Agreement.

**H.     Each MCA-Funder Defendant Retained Full Recourse Rights**

124.    In order to further ensure its performance under each of the MCA Agreements, DeZign granted each MCA-Funder Defendant a security interest in substantially all of its assets including all of its all accounts, chattel paper, documents, equipment, general intangibles, instruments, and inventory (the "Collateral").

125.    Upon an Event of Default, each MCA-Funder Defendant was entitled to exercise all of their rights and remedies under the UCC.

126.    Thus, if DeZign/the pretend seller of the future receipts missed as few daily or weekly payments, for any reason whatsoever, the MCA-Funder Defendant could foreclose on the Collateral.

127.    Additionally, many times, DeZign/the pretend seller of the future receipts was required to and did execute confessions of judgment that could be entered if it defaulted under the MCA Agreements.

128.    Such recourse provisions are not indicative of a true sale, but rather, a loan.

**I.     The Daily or Weekly Payments Were Fixed
and Resulted in a Usurious Interest Rate**

129.    On the face of each of the MCA Agreements, DeZign was required to repay the pretend 'purchased amount' through daily or weekly ACH debits from a designated account as follows:

| MCA-Funder Defendant | Purchase price | Purchased Amount | Payment | No. | Interest rate |
|---|---|---|---|---|---|
| Seamless Capital | $381,000.00 | $476,682.00 | $7,350.00/day | 65 | 145% |
| United Funds | $300,000.00 | $414,000.00 | $9,500.00/day | 44 | 293% |
| Libertas Funding 1 | $650,000.00 | $832,000.00 | $19,809.55/week | 42 | 50% |
| Libertas Funding 2 | $200,000.00 | $258,000.00 | $6,142.90/ week | 42 | 56% |
| Cloudfund | $100,000.00 | $145,000.00 | $7,250.00/week | 20 | 161% |
| Meged Funding | $100,000.00 | $143,000.00 | $4,766.67/day | 30 | 403% |

130.    Once you account for the fees charged, the interest rates are even higher and the amount funded/purchase price is lower:

| MCA-Funder Defendant | Amount Funded | Purchased Amount | Payment | No. | Interest rate |
|---|---|---|---|---|---|
| Seamless Capital | $349,200.00 | $476,682.00 | $7,350.00/day | 65 | 208% |
| United Funds | $300,000.00 | $414,000.00 | $9,500.00/day | 44 | 293% |
| Libertas Funding 1 | $637,000.00 | $832,000.00 | $19,809.55/week | 42 | 56% |
| Libertas Funding 2 | $196,000.00 | $258,000.00 | $6,142.90/ week | 42 | 58% |
| Cloudfund | $94,000.00 | $145,000.00 | $7,250.00/week | 20 | 194% |
| Meged Funding | $92,000.00 | $143,000.00 | $4,766.67/day | 30 | 516% |

131.    There can be no question that the daily or weekly payments under each of the MCA Agreements were fixed.

132.    Under each of the MCA Agreements, DeZign/the pretend seller of the future receipts was obligated to repay the Purchased Amount by remitting a concocted 'specified percentage' of its 'daily receipts' or 'weekly receipts' into a specific designated account (the "Designated Account") and the MCA-Funder Defendant would debit the daily payment from the Designated Account.

133.    While the daily or weekly payments were supposed to equal a specified percentage of DeZign/the pretend seller's daily receipts, in reality, the daily or weekly payments reflected nothing more than how quickly the MCA-Funder Defendant wanted to get paid.

134.    The sham is revealed on the face of the MCA Agreements themselves.  Many times, even advances take from different defendants on the around the same date results in widely different daily payment amounts.   Compare, for example, the two agreements from Libertas Funding (Exhibits C and D).

135.    This is true despite the fact that each of the MCA-Funder Defendants were given viewing access to DeZign/the pretend seller's bank accounts "in order to calculate the amount of such payments."  In other words, the MCA-Funder Defendants undertook to calculate, on daily basis, what the fixed percentage of DeZign/the pretend seller's daily or weekly receipts would be

24

and, on or about a certain day of every month, the MCA-Funder Defendant was supposed to reconcile their collections with the DeZign/the pretend seller's actual receipts to ensure that they never collected more than that fixed percentage of the receipts on a monthly basis.

136.   However, despite being given viewing access to the DeZign/the pretend seller's bank accounts for the express purpose of reconciling them, none of the MCA-Funder Defendants ever actually performed any reconciliation of DeZign/the pretend seller's account nor did they ever intend to do so because the daily or weekly payments were not an actual estimate of the fixed percentage of DeZign/the pretend seller's daily receipts but rather, they were simply a reflection of how quickly the MCA-Funder Defendant wanted to be repaid.

137.   To make matters worse, DeZign/the pretend seller of the future receipts actually requested a reconciliation be performed so that the daily payment more accurately reflected the amount of the receipts purchased but each time the MCA-Funder Defendant refused to perform the required reconciliation.

### J.   DeZign and its Businesses, Finances, and Credit Have Been Demolished as a Result of Defendants' Conduct

138.   Each of the Defendants, and the Defendants collectively, inflicted immense financial and personal harm upon Plaintiffs who they purport to help.  Defendants have pressured Plaintiffs into deceptive and lopsided agreements, loan money to DeZign at triple-digit interest rates, wrongly seize large sums from DeZign's bank accounts, which then resulted in DeZign having to look to other similar merchant cash advance lenders which resulted in the spiral of unending debt we see here.

139.   Each Defendant is responsible for the usurious, fraudulent, and illegal conduct set forth herein.

## FIRST CAUSE OF ACTION
## (RICO:  18 U.S.C. § 1962)

140.    Plaintiffs adopt and reallege paragraphs 1 through 139 as if fully set forth herein.

**A.**    **The Unlawful Activity.**

141.    More than a dozen states, including New York, place limits on the amount of interest that can be charged in connection with providing a loan.

142.    In 1965, the Legislature of New York commissioned an investigation into the illegal practice of loansharking, which, prior to 1965, was not illegal with respect to businesses.

143.    As recognized by the New York Court of Appeals in *Hammelburger v. Foursome Inn Corp.*, 54 N.Y.2d 580, 589 (1981), the Report by the New York State Commission on Investigation entitled An Investigation of the Loan-Shark Racket brought to the attention of the Governor and the public the need for change in both, as well as for change in the immunity statute, and for provisions making criminal the possession of loan-shark records and increasing the grade of assault with respect to the "roughing up tactics" used by usurious lenders to enforce payment."

144.    As a result of this Report, a bill was proposed to allow corporations to interpose the defense of usury in actions to collect principal or interest on loans given at interest greater than twenty-five percent per annum.

145.    This measure was deemed vital in curbing the loan-shark racket as a complement to the basic proposal creating the crime of criminal usury.

146.    As noted above, loan-sharks with full knowledge of the prior law, made it a policy to loan to corporations.

147.    The investigation also disclosed that individual borrowers were required to incorporate before being granted a usurious loan.

148.    Like here, this was a purely artificial device used by the loanshark to evade the law - an evasion that the Legislature sought to prevent.

149.    Among other things, the Report recognized that "it would be most inappropriate to permit a usurer to recover on a loan for which he could be prosecuted."

**B.      Culpable Persons.**

150.    Each of the MCA-Funder Defendants, as well as the various officers and owners of each of the MCA-Funder Defendants, and the investors in these MCA-Funder Defendants, who participated in this illegal scheme (and whose identities will be sought during the course of discovery in this case) are "persons" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. § 1962(c) in that each is either an individual, corporation or limited liability company capable of holding a legal interest in property.

151.    At all relevant times, each of the various officers, owners, and investors of each of the MCA-Funder Defendants (the "RICO Persons") was, and is, a person that exists separate and distinct from the MCA-Funder Defendant itself.

152.    The officers of the MCA-Funder Defendants, who will be identified through discovery, manage and direct one or more of the MCA-Funder Defendants and knowingly participated in the enterprise and the fraudulent scheme described above.

153.    The owners of the MCA-Funder Defendants, who will be identified through discovery, have an ownership interest in one or more of the MCA-Funder Defendants and knowingly participated in the enterprise and the fraudulent scheme described above.

154.    The investors of the MCA-Funder Defendants, who will be identified through discovery, invest capital into one or more of the MCA-Funder Defendants, and receive a significant return on his/her/its investment, and knowingly participated in the enterprise and the fraudulent scheme described above.

155.    Through their operation of the MCA-Funder Defendants, the RICO Persons solicit, underwrite, fund, service and collect upon lawful debt incurred by small businesses in New York (which has usury laws) and other states that do not have usury laws.

C.    **The Enterprise**

156.    Each of the MCA-Funders, together with its respective as officers, owners and investors, constitute an Enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) (each, an "Enterprise").

157.    Each of the MCA-Funders, together with its respective as officers, owners, and investors, are associated in fact and through relations for the common purpose of carrying on an ongoing unlawful enterprise.  Specifically, each Enterprise has a common goal of soliciting, funding, servicing and collecting upon usurious loans that charge interest at more than twice the enforceable rate under the laws of New York and other states.

158.    The members of each Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of originating, underwriting, servicing and collecting upon unlawful debt issued by the Enterprise to small businesses throughout the United States.

159.    The debt, including such debt evidenced by the MCA Agreements, constitutes unlawful debt within the meaning of 18 U.S.C. § 1962(c) and (d) 18 U.S.C. § 1961(6) because (i) it violates applicable criminal usury statutes and (ii) the rates are more than twice the legal rate permitted under New York Penal Law §190.40.

160.    Each MCA-Funder Defendant and the various other members of each Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of collecting upon fraudulent fees through electronic wires.

161.   Each Enterprise's conduct constitutes "fraud by wire" within the meaning of 18 U.S.C. 1343, which is "racketeering activity" as defined by 18 U.S.C. 1961(1).  Its repeated and continuous use of such conduct to participate in the affairs of the Enterprise constitutions a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

**C.     The Roles of the RICO Persons in Operating the Enterprise, and the Roles of the MCA-Funder Defendants within the Enterprise.**

162.   The RICO Persons of each Enterprise have organized themselves and the Enterprise into a cohesive group with specific and assigned responsibilities and a command structure to operate as a unit in order to accomplish the common goals and purposes of collecting upon unlawful debts including as follows:

The Owners and Officers

163.   The John/Jane Doe Defendants who are the owners and officers are the masterminds of each Enterprise.  They are responsible for the day-to-day operations of the Enterprise and have final say on all business decisions of the Enterprise including, without limitation, which usurious loans the Enterprise will fund, how such loans will be funded, which of Investors will fund each loan and the ultimate payment terms, amount and period of each usurious loan.

164.   In such capacity, the John/Jane Doe Defendants who are the owners and officers of each Enterprise are responsible for creating, approving and implementing the policies, practices and instrumentalities used by each Enterprise to accomplish its common goals and purposes including: (i) the form of merchant agreements used by the Enterprise to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Enterprise's collection of an unlawful debt; (ii) the method of collecting the daily or weekly payments via ACH withdrawals; and (iii) form Affidavits of Confession used by the Enterprise to collect upon the unlawful debt if the borrower defaults upon its obligations.  All

such forms were used to make and collect upon the unlawful loans including, without limitation, loans extended to the Plaintiffs here.

165.    The John/Jane Doe Defendants who are the owners and officers of each Enterprise also taken actions and, directed other members of the Enterprise to take actions necessary to accomplish the overall goals and purposes of the Enterprise including directing the affairs of the Enterprise, funding the Enterprise, directing members of the Enterprise to collect upon the unlawful loans and executing legal documents in support of the Enterprise.

166.    The John/Jane Doe Defendants who are the owners and officers of each Enterprise have ultimately benefited from the Enterprise's funneling of the usurious loan proceeds to the owners and investors.

The MCA-Funder Defendants

167.    Each of MCA-Funder Defendants is a corporation or limited liability company organized under the laws of the state of New York or such other state of organization/incorporation set forth above.  Each of the MCA-Funder Defendants maintains officers, books, records, and bank accounts independent of the John/Jane Doe Defendants who are the owners, officers and investors of each Enterprise.

168.    Each of the MCA-Funder Defendants are operated as part of an unlawful enterprise to collect upon unlawful debt and commit wire fraud.  Pursuant to his/her/its membership in an Enterprise, the John/Jane Doe Defendants who are the owners and officers of each Enterprise has: (i) entered into contracts with brokers to solicit borrowers for the Enterprise's usurious loans and participation agreements with the John/Jane Doe Investor Defendants to fund the usurious loans; (ii) pooled the funds of Investors in order to fund each usurious loan; (iii) underwritten the usurious loans and determining the ultimate rate of usurious interest to be charged under each loan; (iv) entered into the so-called merchant agreements on behalf of the Enterprise; (v) serviced the usurious loans; (vi) set-up and implemented the ACH

withdrawals used by the Enterprise to collect upon the unlawful debt; and (v) obtained judgments in its name to further collect upon the unlawful debt.

169.    In this case, the John/Jane Doe Defendants who are the owners and officers of each Enterprise and the John/Jane Doe Investors: (i) solicited borrowers; (ii) pooled funds from Investors to fund the MCA Agreements; (iii) underwrote the MCA Agreements; (iv) entered into the MCA Agreements; and (v) collected upon the unlawful debt evidenced by the MCA Agreements by effecting daily ACH withdrawals from the bank accounts of one or more of the Plaintiffs.

The John/Jane Doe Investors

170.    The John and Jane Doe Investors are a group of organizations and individual investors who maintain separate officers, books, records, and bank accounts independent of MCA-Funder Defendants.

171.    Directly and through their members, agent officers, and/or employees, the Investors have been and continue to be responsible for providing MCA-Funder Defendants with all or a portion of the pooled funds necessary to fund the usurious loans, including the MCA Agreements, and to approve and ratify the Enterprise's efforts to collect upon the unlawful debts by, among other things, approving early payoff terms, settlement agreements and other financial arrangements with borrowers to collect upon the unlawful debt.

172.    The Investors ultimately benefit from the Enterprise's unlawful activity when the proceeds of collecting upon the unlawful debts are funneled to the Investors according to their level of participation in the usurious loans.

**E.    Interstate Commerce**

173.    The Enterprise is engaged in interstate commerce and uses instrumentalities of interstate commerce in its daily business activities.

174.    Specifically, members of each Enterprise maintain offices in either New York, Delaware and/or Florida and use personnel in these offices to originate, underwrite, fund, service and collect upon the usurious loans made by the Enterprise to DeZign in Colorado, and throughout the United States, via extensive use of interstate emails, mail, wire transfers and bank withdrawals processed through an automated clearing house.

175.    In the present case, much of the communications between the members of each Enterprise, were by interstate email and mail, wire transfers or ACH debits and other interstate wire communications.    Specifically, each Enterprise used interstate emails to originate, underwrite, service and collect upon the Agreements, fund the advances under each of the Agreements and collect the daily or weekly payments via interstate electronic ACH debits.

**F.    Injury and Causation.**

176.    Each Plaintiff has and will continue to be injured in their business and property by reason of the Enterprise's violations of 18 U.S.C. § 1962(c).

177.    The injuries to each Plaintiff directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited to, hundreds of thousands of dollars in improperly collected criminally usurious loan payments and the unlawful entry and enforcement of judgments.

178.    Each Plaintiffs has also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

179.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from Defendants.

**SECOND CAUSE OF ACTION**
**(CONSPIRACY UNDER 18 U.S.C. § 1962(d))**

180.    Plaintiffs adopt and reallege paragraphs 1 through 139 as if fully set forth herein.

181.    Each Defendant has unlawfully, knowingly, and willfully, combined, conspired, confederated, and agreed, together with the other members of his/her/its Enterprise, to violate 18 U.S.C. § 1962(c) as describe above, in violation of 18 U.S.C. § 1962(d).

182.    By and through each of the Defendants' business relationships with the other members of his/her/its Enterprise, their close coordination with one another in the affairs of the Enterprise, and frequent email communications among such Defendants concerning the underwriting, funding, servicing and collection of the unlawful loans, including the MCA Agreements, each Defendant knew the nature of the Enterprise and each Defendant knew that the Enterprise extended beyond each Defendant's individual role.   Moreover, through the same connections and coordination, each Defendant knew that the other Defendants in his/her/its Enterprise were engaged in a conspiracy to collect upon unlawful debts in violation of 18 U.S.C. § 1962(c).

183.    Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of an Enterprise's affairs in order to collect upon unlawful debts, including the MCA Agreements, in violation of 18 U.S.C. § 1962(c).   In particular, each Defendant was a knowing, willing, and active participant in one or more of the Enterprises and its affairs, and each of the

184.    The Defendants who participated in each Enterprise shared a common purpose, namely, the orchestration, planning, preparation, and execution of the scheme to solicit, underwrite, fund and collect upon unlawful debts, including the MCA Agreements within that Enterprise.

185.    Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of such Enterprise's affairs in order to commit wire fraud through a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

186.    The participation and agreement of each of Defendant in the Enterprise was necessary to allow the commission of this scheme.

187.    Each Plaintiff has been and will continue to be injured in their business and property by reason of the Defendants' violations of 18 U.S.C. § 1962(d), in an amount to be determined at the hearing.

188.    The injuries to each Plaintiff are directly, proximately, and reasonably foreseeably resulting from or cause these violations of 18 U.S.C. § 1962(d) include, but are not limited to, millions of dollars in improperly collected loan payments.

189.    Each Plaintiff has also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

190.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from the Defendants.

## THIRD CAUSE OF ACTION
## <u>(BREACH OF CONTRACT)</u>

191.    Plaintiffs adopt and reallege paragraphs 1 through 190 as if fully set forth herein.

192.    Assuming a valid contract existed, each MCA-Funder Defendant breached the respective and applicable MCA Agreement by:

a.  Refusing to reconcile the daily or weekly payments and have such payments be a true reflection of the daily receipts based on the amount of receivables allegedly purchased; and

b.  Not funding the amount required under the respective agreement.

193.    DeZign suffered damages as a direct and proximate result of MCA-Funder Defendant's breach.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment in their favor against Defendants and seek an

Order:

a)   Declaring each of the MCA Agreements to be a usurious loan in violation of New

York Penal Law §190.40 and thus void and unenforceable;

b)   Awarding compensatory, direct, and consequential damages, including

prejudgment interest, in an amount to be determined at a hearing;

c)   Awarding treble damages;

d)   Requiring Defendants to pay Plaintiffs' attorneys' fees and costs; and

e)   Any further relief deemed appropriate by the Court.

Dated this 28th day of November, 2022.

Respectfully submitted,


 /s/  John M. Stravato
**JOHN M. STRAVATO, ESQ.**
5 Bagatelle Road
Dix Hills, New York  11746
Email:        johnmstravato@gmail.com
Telephone:    (516) 633-2639
*Trial Counsel for Plaintiffs*